Cesar Javier FLORES, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–93–00554–CR.

Court of Appeals of Texas, San Antonio.

Feb. 8, 1995.

Phillip R. Spicer, Jr., Taylor & Spicer, San Antonio, for appellant.

Martha A. Hardy, Asst. County Atty., Guadalupe County, Seguin, for appellee.

Before RICKHOFF, LOPEZ and GREEN, JJ.

## OPINION

RICKHOFF, Justice.

Cesar Flores, appellant, was convicted of unlawfully carrying a weapon. He raises three points of error: (1) that his motion to suppress the evidence of guns found in his car was wrongly denied; (2) that there was insufficient evidence to support the conviction; and (3) that his motion for directed verdict was wrongly denied. We affirm.

### BACKGROUND

Joe Patterson testified at the pre-trial suppression hearing that around 8:00 p.m. on March 28, 1993, after his children and others had just completed little league practice, he saw headlights and heard rapid gunfire coming from an area northeast of his position, behind the park swimming pool. Patterson said he had been a "weapons expert" in the military. He used a cellular telephone to dial 911. He watched the headlights until a "white-with-blue-trim Bronco" appeared. He testified that he saw no other vehicles in the vicinity of the shooting. He was on the phone with the dispatcher when the vehicle came close enough for him to see that it contained a driver and one passenger. Patterson described the vehicle's location and direction as it exited the east side of the park. He also said he heard a number of shots fired from the area where the Bronco was. Just as he was hanging-up the phone, he noticed a police car turn around and follow the vehicle with lights flashing.

During the trial,[1] he testified that he had at first told the children on the field to get down because he did not know whether the shots were fired in their direction. He estimated the range at about 200 to 250 yards away. He said the headlights he observed were from the only vehicle in the vicinity and he visually followed the headlights until he could identify the vehicle and the figures of two people inside. He saw a police (as it turned out, Officer Skrzycki's) vehicle follow the same Bronco and later saw a wrecker picking it up at a nearby Circle K store. On cross-examination he stated he could not actually see the muzzle flash coming from the Bronco when the shots were fired.

Shannon Hollamon, a police dispatcher with the Seguin Police Department, also testified at trial. During her testimony the State introduced State's Exhibit No. 1, a transcription of Patterson's 911 telephone call.[2] It reads as follows:

1. In considering trial testimony, we are aware of the general rule that, in reviewing the trial court's overruling of a pre-trial motion, an appellate court should consider only the evidence adduced at the hearing on that motion. *Hardesty v. State*, 667 S.W.2d 130, 133 n. 6 (Tex.Crim.App. 1984). If, however, the issue is consensually relitigated by the parties during the trial on the merits, the appellate court may properly consider relevant trial testimony. *Id.* For example, if the State introduces evidence relevant to the suppression issue and the defendant either fails to object or subsequently participates in the inquiry, he has elected to reopen the evidence on that issue. *Id. See also Gearing v. State*, 685 S.W.2d 326, 329 (Tex.Crim.App.1985) (when accused fails to object during trial to complained of evidence, he waives any error in its admission despite pre-trial ruling); *Gaston v. State*, 574 S.W.2d 120, 121 (Tex.Crim.App.1978) (defendant objected to relitigation of issue). In this case, there was no objection to the trial testimony of Joe Patterson, Officer Tarinna Skrzycki, or Officer Thomas Edward Meeley. Indeed, defense counsel thoroughly cross-examined these witnesses concerning the substance of their testimony and, in particular, the events surrounding appellant's seizure and arrest. We will therefore consider their trial testimony in determining whether the trial court erred in denying the motion to suppress.

2. When the 911 transcript was introduced at trial, defense counsel objected to the tape as "unauthenticated hearsay," but counsel said he had "no objections, of course, to the dispatcher's comments on the tape...." The trial court does not appear to have ruled on counsel's objection, nor did counsel ask for a ruling. In any event, defense counsel proceeded to cross-examine Ms. Hollamon concerning the substance of her testimony, i.e., the events surrounding Patterson's 911 telephone call. Without objection from the defense, the court used also included in its charge an instruction on investigative detention. The jurors were told that if they found from the evidence that "there was no probable cause to stop the defendant, ... or you have a reasonable doubt thereof, you will disregard the testimony of the officer relative to his stopping the defendant...." Moreover, the issue of the 911 tape was raised by the State during its closing argument, again without objection from defense counsel. We hold that the issue of appellant's

DISPATCHER SHANNON HOLLA-MON: Seguin Police?

JOE PATTERSON: Yes, this is Joe Patterson.

DISPATCHER: Yes.

PATTERSON: I'm down at the Senior League baseball field at Little League Complex.

DISPATCHER: Right.

PATTERSON: And some fool is riding through the park area, Parkview.

DISPATCHER: Is he shooting?

PATTERSON: Yes.

DISPATCHER: What kind of car?

PATTERSON: It was a pick-up—it wasn't a pick-up. It was a Ford Bronco, possible—

DISPATCHER: Ford.

PATTERSON: —white and—

DISPATCHER: Hang on.

PATTERSON: —blue and white. You heard it already?

DISPATCHER: Blue and white Ford Bronco. Hang on. Seguin 945. Which way is it headed?

PATTERSON: Right now, it's going back into the park area, over by the—

DISPATCHER: Okay. The shots are seen coming from a blue and white Ford Bronco headed back into the park area. To like the—on the east—east side of the park?

PATTERSON: Yes.

DISPATCHER: Seguin 945, it will be on the east side of the park.

PATTERSON: You all got calls on it?

DISPATCHER: Yeah, uh-huh, but we didn't have vehicle description so this—

PATTERSON: Yeah.

DISPATCHER: —helps us tremendously. What's your—

PATTERSON: Sound [sic] like a nine millimeter.

DISPATCHER: Sound [sic] like a nine millimeter, is what they're shooting.

OFFICER: 10–4, come—coming up to Guadalupe.

PATTERSON: Yes.

DISPATCHER: Okay.

PATTERSON: All righty?

DISPATCHER: Okay. What's your phone number?

PATTERSON: I'm at a—I'm at a mobile.

DISPATCHER: Okay.

PATTERSON: 260–8586.

DISPATCHER: Okay. Can you still see the vehicle?

PATTERSON: No, it's gone out of sight.

UNKNOWN: 41, 46.

DISPATCHER: Okay. Thank you, sir.

PATTERSON: Uh-huh.

DISPATCHER: Bye-bye.

PATTERSON: Bye-bye.

Tarinna Skrzycki, a Seguin police officer, testified at the suppression hearing that she received a call reporting shots fired in an area three to four blocks from the park. While responding to that call she received another dispatch concerning shots fired on the east side of the park. The vehicle was described as a white and blue Bronco and was reported to be leaving the east side of the park. She observed a vehicle matching this description in the area reported by the dispatcher. She turned around, activated her police lights and pulled up behind the vehicle at a Circle K store. When she exited her patrol car the driver of the Bronco opened the door but did not get out. For her own safety, she said she pulled her revolver and asked both occupants to step out and put their hands on top of the Bronco. She testified that the suspects were not free to leave until she completed her investigation, but that they were not handcuffed until the weapons were found.

Officer Thomas Edward Meeley testified at the suppression hearing and at trial that after hearing a dispatch concerning shots fired from a white and blue Bronco, he arrived on the scene after Officer Skrzycki and, in his words, "I exited my patrol car, walked

seizure and arrest was consensually relitigated by the parties at trial. We will therefore consider the 911 transcript in determining whether the trial court erred in overruling the motion to suppress.

up and checked the vehicle real quick; and I saw a clip laying on the center console of the vehicle." In the closed console he found a semiautomatic Glock .40 pistol that matched the clip. Both contained black talon rounds. He then went around the side of the vehicle and placed the suspects in handcuffs. Behind the driver's seat he found a loaded Login .380 handgun in a paper bag on the floor behind the driver's seat. A third officer testified that he found a .22 caliber rifle and a box of bullets in a case in the back of the Bronco.

The Bronco's passenger, Abel Soto, did not testify at the suppression hearing. However, he testified at trial that he asked the defendant to give him a ride but did not tell him he was carrying the guns (which he claimed belonged to his friend, Bryan Belmarez, who also testified at trial) because, "I knew Cesar wouldn't let me take the guns in his vehicle." He claimed he hid the two handguns in the car without telling the defendant. Soto acknowledged the rifle belonged to the defendant. He said they went to the park to use the restroom.

### DISCUSSION

#### Introduction

The trial court denied appellant's motion to suppress the evidence of the two handguns. Appellant argues that these guns were found during an invalid search and seizure based on an illegal arrest. The State claims on appeal that the seizure was premised on a legitimate investigative detention, *see Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), or alternatively, that it was a warrantless arrest based on probable cause. We will address each argument in turn.

#### The Standard of Review

At a suppression hearing, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990). The trial judge may accept or reject any or all of the witnesses' testimony. *Johnson v. State,* 803 S.W.2d 272, 287 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), *overruled on other*

grounds, *Heitman v. State,* 815 S.W.2d 681, 685 n. 6 (Tex.Crim.App.1991).

As an appellate court, our review of the evidence is limited to determining whether the trial court erred in applying the law to the facts. *See Romero,* 800 S.W.2d at 543. Absent a showing of an abuse of discretion, we will not disturb the trial court's findings. *Maddox v. State,* 682 S.W.2d 563, 564 (Tex. Crim.App.1985). Moreover, we review the evidence in the light most favorable to the trial court's ruling. *Daniels v. State,* 718 S.W.2d 702, 704 (Tex.Crim.App.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled on other grounds, Juarez v. State,* 758 S.W.2d 772, 780 n. 3 (Tex. Crim.App.1988). So long as the evidence supports the trial court's ruling, we cannot disturb that ruling. *Johnson,* 803 S.W.2d at 287.

#### Investigatory Detention

Law enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *See Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Under a *Terry* investigative stop or detention, officers are allowed to briefly question a suspicious person regarding his identity, his reason for being in the area or location, and to make similar reasonable inquiries of a truly investigative nature. To justify this temporary detention, an officer must have specific articulable facts which, considering his experience and personal knowledge and his inferences from those facts, would reasonably warrant an intrusion on the freedom of the citizen stopped for investigation. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879. Moreover, unusual activity must be occurring or have occurred, the accused must be connected with the suspicious activity, and the suspicious activity must be connected with the crime. *See Johnson v. State,* 658 S.W.2d 623, 626 (Tex.Crim.App.1983).

Once a suspect is lawfully detained for investigation, the officer may conduct a limited search for weapons where it is reasonably warranted for his safety or the

safety of others. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. A search pursuant to an investigative detention "is limited to a search *for weapons* in circumstances where the officers have a *reasonable belief that the suspect is potentially dangerous to them.*" *Michigan v. Long*, 463 U.S. 1032, 1052, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201 (1983) (emphasis added). "[W]e stress that a *Terry* investigation ... involves a police investigation 'at close range,' ... when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been affected...." 463 U.S. at 1052, 103 S.Ct. at 3482, 77 L.Ed.2d at 1222 (emphasis in original) (citations omitted). In the final analysis, the characterization of the detention must be reviewed in light of all the facts and circumstances surrounding the stop. *Hoag v. State*, 728 S.W.2d 375, 379 (Tex.Crim.App.1987).

██ An arrest, on the other hand, requires probable cause and occurs when a person's liberty of movement is restricted or restrained. *Amores v. State*, 816 S.W.2d 407, 411 (Tex.Crim.App.1991). Article 15.22 of the Code of Criminal Procedure provides that "a person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without warrant." Tex.Code Crim.

3. In *Amores*, the defendant, a black male, was observed in a predominantly white apartment complex removing a box from the open trunk of his car. 816 S.W.2d at 409–10. The apartment manager called the Dallas police and reported the incident, which she believed to be a burglary in progress; no other details were conveyed. *Id.* at 409. Acting on a report from a dispatcher's "... radio call [regarding] a 'burglary in progress' at the Square Apartments involving a 'black male' ...", an officer proceeded to the complex where he saw the defendant (who had by now changed cars) beginning to drive away. *Id.* at 409–10. The officer then:

> ... blocked the appellant's car in the parking lot, drew his service revolver, ordered the appellant from his car at gunpoint, ordered him to lie face-down on the pavement with his hands behind his back, and told him he would be shot if he did not obey these orders.

*Id.* at 411. The Court of Criminal Appeals determined the detention was an arrest rather than a *Terry* stop. *Id.* at 412.

4. In *Hoag*, a burglary victim gave a general description of the burglar and his car, and tenta-

Proc.Ann. art. 15.22 (Vernon 1989). The Court of Criminal Appeals has interpreted article 15.22 to mean that an arrest is complete at the moment a person's freedom of movement is restricted or restrained. *Amores*, 816 S.W.2d at 411;[3] *Hoag*, 728 S.W.2d at 379.[4] *See also White v. State*, 601 S.W.2d 364, 366 (Tex.Crim.App.1980); *Colston v. State*, 511 S.W.2d 10, 12 (Tex.Crim. App.1974).

██ Viewed in this light, the initial detention in this case was in fact an arrest. Appellant was forced to exit his car at gunpoint, assume a spread-eagle position with his hands on the roof of his car, and remain there. Officer Skrzycki testified that the suspects were not free to leave until she completed her investigation. These facts are sufficient to show that appellant's liberty was restricted or restrained to such a degree as to constitute an arrest.

## Warrantless Arrest

██ We will not reverse, however, because the trial judge could have found—considering the evidence and the inferences the court could draw from that evidence—that the officers had probable cause to arrest the defendant.

tively identified Hoag from a photo array. 728 S.W.2d at 377. Officers placed Hoag under surveillance. *Id.* After following him to two houses and an apartment complex, police had not observed criminal activity or found signs that a burglary had been committed. *Id.* When Hoag returned to his car from the apartment complex, he appeared to place something on the floorboard. *Id.* Hoag was stopped a few blocks away. *Id.* An officer approached Hoag and asked him to get out of the car. *Id.* Hoag was then taken at gunpoint to the rear of his car, where officers read him his *Miranda* warnings. *Id.* The arresting officer testified that he believed Hoag was under arrest at that time. *Id.* The officers on the scene did not conduct a patdown search of Hoag. *Id.* at 381. With Hoag still surrounded by officers, one officer went back and looked inside the passenger compartment of Hoag's car and saw a diving knife sticking out from under the floormat. *Id.* at 378. The officer flipped back to the mat and found jewelry and coins. *Id.* The Court of Criminal Appeals held that the seizure of Hoag was a warrantless arrest not supported by probable cause. *Id.* at 379.

Warrantless arrests in Texas are authorized only in limited circumstances and are governed primarily by Chapter Fourteen of the Code of Criminal Procedure. Article 14.01(b), for example, authorizes a warrantless arrest for an offense committed within the officer's presence or view. TEX.CODE CRIM.PROC.ANN. art. 14.01(b) (Vernon 1989). Article 14.03(a)(1) authorizes a warrantless arrest of "persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of peace" Id. at art. 14.03(a)(1). TEX.CODE CRIM.PROC.ANN. art. 14.04 provides for warrantless arrests "where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed and that the offender is about to escape."

■ Article 14.03(a)(1) requires the legal equivalent of constitutional probable cause. *Amores*, 816 S.W.2d at 413; *Johnson v. State*, 722 S.W.2d 417, 421 (Tex.Crim.App. 1986) (Article 14.03(a)(1) requires "the functional equivalent of probable cause to believe that a particular person has committed a felony"). A "totality of the circumstances" test applies in Texas for determining probable cause based on a warrantless search and seizure. *Amores*, 816 S.W.2d at 413; *Eisenhauer v. State*, 754 S.W.2d 159 (Tex.Crim. App.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988).

> Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a particular person has committed or is committing an offense.

*Amores*, 816 S.W.2d at 413. The Supreme Court has made the following observations about probable cause:

> These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

*Woodward v. State*, 668 S.W.2d 337, 343–44 (Tex.Crim.App.1982), *quoting Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949).

In determining whether a warrantless arrest is justified under article 14.03(a)(1), the Court of Criminal Appeals has held that where events are as consistent with innocent activity as with criminal activity, the detention of a suspect based on these events is unlawful. *Hoag*, 728 S.W.2d at 379; *Johnson v. State*, 658 S.W.2d 623 (Tex.Crim.App. 1983); *Schwartz v. State*, 635 S.W.2d 545 (Tex.Crim.App.1982).

Turning first to the question of probable cause, the record reflects that Patterson correctly identified the suspect vehicle and precisely described its appearance and location. The dispatcher in this case, moreover, twice verified that the caller was sure the firing was coming from the Bronco. Once this information was communicated through the dispatcher to the field officers, they relied on the dispatcher's report to search for a vehicle matching the caller's description. Officer Skrzycki therefore had information leading her to believe that a crime involving a breach of the peace had already been committed. The dispatcher was transmitting information as it was received and that information, which contained an accurate description of the vehicle and its location, was confirmed by Officer Skrzycki's own observations. Only one vehicle was observed in the vicinity of the shooting and that vehicle matched the description of the dispatcher. It was leaving an area where shots were reported fired. Considering the totality of the evidence and the inferences the trial court could draw

from that evidence, the court could have determined there was probable cause for a warrantless arrest under article 14.03(a)(1).

As for the "suspicious places" element of article 14.03(a)(1), the Court of Criminal Appeals has noted that few, if any, places are suspicious in and of themselves, and that article 14.03 should be applied to authorize warrantless arrest in only limited circumstances. *Johnson,* 722 S.W.2d at 417. Determining whether a place is suspicious, however, is highly fact-specific. *See Holland v. State,* 788 S.W.2d 112, 113 (Tex.App.— Dallas 1990, pet. ref'd), *citing King v. State,* 631 S.W.2d 486, 497 (Tex.Crim.App.), *cert. denied,* 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982). Moreover, a place may become suspicious, from a police officer's perspective, due to facts and circumstances known to the officer and any reasonable inferences that can be drawn from those facts. *Muniz v. State,* 851 S.W.2d 238, 251 (Tex. Crim.App.), *cert. denied,* — U.S. —, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *Johnson,* 722 S.W.2d at 421. Such is the case here.

Officer Skrzycki could have determined the Bronco was in a suspicious place. Only one vehicle was observed in the vicinity of the shooting, a blue and white Ford Bronco. It matched the description Officer Skrzycki received from the dispatcher: a blue and white Ford Bronco. The dispatcher twice verified that the caller was sure the firing was coming from the Bronco. The Bronco was seen leaving the area. While the park where appellant's vehicle was observed is not a suspicious place per se, these facts, together with reasonable conclusions Officer Skrzycki could have drawn from those facts, made the site a place where officers could reasonably suspect that a crime had occurred. Moreover, appellant's presence was not contrived by law enforcement officers to circumvent the warrant requirement, and the vehicle in which he was traveling had a lower expectation of privacy.[5] We therefore conclude that appellant's vehicle was in a suspicious place under circumstances that showed there had been some offense against the law or breach of peace. Appellant's arrest was, in other words, justified under article 14.03(a)(1).

In reaching this conclusion, we are aware that as a general rule, neither a police broadcast nor an anonymous phone call is sufficient, standing alone, to establish probable cause for an arrest. *Amores,* 816 S.W.2d at 416. There must be additional facts available to the officer, or the dispatcher, which would warrant a person of reasonable caution to conclude that a crime had been or was being committed. *Id.* In this case, however, Patterson testified to the facts surrounding his call both at the suppression hearing and at trial. In particular, he testified that he identified himself by name to the 911 dispatcher before hanging-up the phone. The transcript of his 911 call, moreover, shows that he gave both his name *and* mobile telephone number to the police dispatcher. His call was not anonymous. Compare this with *Amores,* where the court noted that the record did not show whether the caller's identity was known to the officer *or* the dispatcher at the time of the arrest. *Id.* at 415. For these reasons, we find there is an additional element of believability in this case that was lacking in those cases where courts questioned either the source or the credibility of the information provided by the informant. *See, e.g., Colston,* 511 S.W.2d at 13.

*Amores* relies heavily on *Colston,* a case that is cited by appellant. In *Colston,* officers from the Department of Public Safety issued a report naming Colston, describing the make and license number of his car, and advising that he was believed to be carrying narcotics and was heavily armed. 511 S.W.2d at 11. The report was originated by a federal narcotics agent in San Antonio. *Id.* Officers located Colston's car in the parking

---

5. The Supreme Court has observed that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). One's reduced expectation of privacy in their vehicle is reduced because vehicles that are capable of traveling on public highways are subject to pervasive government regulation. *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2069–2070, 85 L.Ed.2d 406 (1985). In other words, everyday citizens expect to be accorded less privacy in their cars because the government has a compelling need to regulate automobiles. *Id.*

lot of a local lounge, arresting him as he was about to enter his car. *Id.* The Court of Criminal Appeals found that the arrest was not supported by probable cause because the arresting officers had not observed any unusual conduct on the part of Colston that would corroborate the information contained in the federal narcotic agent's report. *Id.* at 12. Although the court concluded that the arresting officers were entitled to rely on another officer's request to arrest, the court noted that the record did not reflect probable cause, since the federal officer who requested the report was not called to testify about the basis of his information. *Id.* at 12–13.

In this case, there was no police request for arrest. Patterson was a citizen-informant who testified both at the suppression hearing and later at trial about the basis for his report to the police. His information was at least partially corroborated by Officer Skrzycki's own observations of the Bronco and the direction it was traveling.

> [W]hile we recognize that the existence of probable cause is a mixed question of fact and law, in most cases the determination of probable cause is necessarily a combination of an examination of the facts and the reasonable inferences that can be drawn from those facts. The officer at the scene is not limited to the facts as presented, but must also be allowed to draw reasonable inferences from those facts.

*Amores,* 816 S.W.2d at 422 (Campbell, J., dissenting). We hold that Patterson's reliability was a factor the trial court could have considered in determining whether there was probable cause at the time of appellant's arrest.

The dissent has reviewed the officers' testimony and challenges the reasonableness of their actions on the night of the arrest. The dissent concludes that the officers failed to pursue "a means of investigation which con-firmed or dispelled their suspicions quickly and in a manner that did not exceed the scope of the detention," [6] and that they failed to use "the least intrusive" method reasonably available "to confirm or dispel their suspicions in a brief period of time."

We have also examined the officers' behavior on that evening and find it reasonable, given the circumstances. The relevant facts are again worth noting. The dispatcher received a call from a citizen who identified himself, gave his location, and identified the suspect vehicle and its location. The dispatcher had no alternative, "in the brief period of time allotted," but to alert the officers in the field as to the suspect vehicle's description and location. Officer Skrzycki saw a vehicle that matched the description she received from the dispatcher, and she followed that vehicle. She could have followed the vehicle into the night without stopping it, but this hardly seems like a more reasonable alternative, since it increases the risk to both the officer and the community. Once she stopped the vehicle and the occupants refused to exit, what alternative did she have but to draw her weapon and order them out? Officer Skrzycki was alone, at night, with two suspects whom she suspected were armed and dangerous. One supposes she could have approached the vehicle with her weapon in its holster, but this hardly seems like a preferred police method, given the times in which we live. Under the circumstances, what else could the officers have done "to confirm or dispel their suspicions in a brief period of time"?

■ Having determined the trial court could have found that appellant's arrest was justified under article 14.03(a)(1), the officers were then entitled to conduct a search incident to the arrest. Once there is probable cause for an arrest, the officers can search appellant's person and the area "within his

---

6. In questioning the reasonableness of the officers' actions, the dissent cites *Ussery v. State,* 651 S.W.2d 767, 770 (Tex.Crim.App.1983) and *Anderson v. State,* 787 S.W.2d 221, 229 (Tex. App.—Fort Worth 1990, no pet.). Neither case, however, is persuasive. In *Ussery,* for example, the court specifically noted that the State "concedes in its brief on appeal that no sufficient probable cause for the appellant's arrest existed at either the early morning or evening detention...." 651 S.W.2d at 771. *Anderson* involved a rape suspect who was arrested after the officers saw him walk into his bedroom and pick up a set of car keys. The court noted that "in order to insure that appellant would not escape and for their own protection, the officers had a right to follow appellant into the bedroom." 787 S.W.2d at 229.

immediate control." *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The interior of a passenger vehicle is "within the immediate control of the arrestee." *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). "[A]rticles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon' . . ." *Id.* at 460, 101 S.Ct. at 2864. Moreover, "the police may examine the contents of any open or closed containers found within the passenger compartment." *Id.* The search for weapons incident to the arrest also revealed the ammunition clip, which was in plain view. Any items in "plain view" that the officers had reason to believe were evidence, fruits of, or instrumentalities of a crime could be seized. *See, e.g., White v. State,* 729 S.W.2d 737, 741 (Tex.Crim.App.1987). We therefore hold that the ammunition clip, and subsequently the two weapons, were found within the scope of a search incident to an arrest. Appellant's first point of error is accordingly overruled.

*Sufficiency of the Evidence*

Appellant's second point of error argues that his conviction was not supported by sufficient evidence. He complains in his third point of error that the trial court should not have denied his motion for a directed verdict. A challenge to a ruling on a motion for a directed verdict is essentially a challenge to the sufficiency of the evidence. *Payton v. State,* 830 S.W.2d 722, 730 (Tex. App.—Houston [14th Dist.] 1992, no pet.). We will therefore address these two points together.

In reviewing the sufficiency of the evidence, this court must determine whether, considering the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). This standard is applicable to all convictions regardless of whether they are supported by direct or circumstantial evidence. *Geesa v. State,* 820 S.W.2d 154, 155 (Tex.Crim.App.1991). In our review of the sufficiency of the evidence, we must consider all the evidence which the jury was permitted, rightly or wrongly, to consider. *Johnson v. State,* 871 S.W.2d 183, 186 (Tex. Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994); *Rodriguez v. State,* 819 S.W.2d 871, 873 (Tex. Crim.App.1991).

Appellant was charged with knowingly or intentionally carrying a handgun on or about his person. *See* Tex.Penal Code Ann. § 46.02 (Vernon 1994). Appellant does not challenge any failure by the State to establish that the weapons were "carried on or about his person." Rather, appellant specifically argues that there was insufficient evidence to show his intent to carry a weapon. He argues that the evidence must "affirmatively link" the weapons to appellant to the extent that a reasonable inference could be drawn that appellant knew of the weapon's existence and its whereabouts. Appellant confuses the standard of proof connected with "possession" cases with the standard required in "carrying on and about his person" cases under section 46.02. The Texas Court of Criminal Appeals established the "affirmative link" standard in cases in which possession of contraband is an element of the crime charged, holding that the evidence must affirmatively link the accused to the contraband. *See Payne v. State,* 480 S.W.2d 732, 734 (Tex.Crim.App.1972); *Haynes v. State,* 475 S.W.2d 739, 742 (Tex.Crim.App. 1971).

The element of possession was specifically distinguished from the element of "carrying on or about a person" in *Christian v. State,* 686 S.W.2d 930, 932 (Tex.Crim.App.1985). *See Young v. State,* 752 S.W.2d 137, 139–40 (Tex.App.—Dallas 1988, pet. ref'd). "Possession" means "actual care, custody, control or management." *Christian,* 686 S.W.2d at 932. In contrast, "carrying" denotes an element of asportation or conveyance. *Christian,* 686 S.W.2d at 933. "On or about the person" has been construed to mean "nearby, close at hand" or within such distance of the accused that he can reach it without materially

changing his position. *Courtney v. State,* 424 S.W.2d 440 (Tex.Crim.App.1968); *Wagner v. State,* 80 Tex.Crim. 66, 188 S.W. 1001, 1002 (1916); *Burks v. State,* 693 S.W.2d 747, 751 (Tex.App.—Houston [14th Dist.] 1985, pet. ref'd).

In the instant case, the evidence is sufficient to hold that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. First, the evidence clearly showed that appellant was driving the Bronco at the time he was apprehended with the handguns, thus satisfying the asportation element of the crime. Second, the evidence showed that the two handguns were respectively found in the unlocked console beside the driver's seat and in a paper bag behind the driver's seat. This was sufficient evidence to show that the guns were within appellant's easy reach, thus satisfying the "on or about the person" element of the crime. Third, the evidence showed that a loaded ammunition clip matching the gun found inside the console was found on top of the console, in plain view. This evidence was sufficient evidence to show that appellant knew he was transporting handguns, the third element of the crime. Taken together, the evidence is therefore sufficient to sustain the conviction for unlawfully carrying a handgun. Points of error two and three are therefore overruled, and the judgment is affirmed.

1. Appellant argues that the "test" for determining whether an arrest has been made is "whether there has been such a display of official authority that a reasonable person would believe he was not free to leave." I do not believe this is an accurate statement of the law. Appellant cites to *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) and *Daniels v. State,* 718 S.W.2d 702, 706 (Tex.Crim. App.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled in part on other grounds, Juarez v. State,* 758 S.W.2d 772 (Tex. Crim.App.1988), in support of his argument. However, both those cases are cases construing the definition of *seizure,* not *arrest,* under the Fourth Amendment. It is important to make the distinction between seizure under the Fourth Amendment and arrest under Texas law. Both investigatory detentions and arrests are considered "seizures" under the Fourth Amendment, as *Mendenhall* and *Daniels* make clear. Appellant also cites to *Woods v. State,* 806 S.W.2d 351, 353 (Tex.App.—Texarkana 1991, pet. ref'd). In

LOPEZ, Justice, dissenting.

I agree with the majority's conclusion that Officer Skrzycki's initial stop and detention of appellant was an arrest, and not an investigatory detention. However, because I do not agree that the arrest was a legal warrantless arrest, I respectfully dissent.

### a. Investigatory Detention

I concur with the majority that the initial detention at gunpoint was an arrest, not an investigatory detention, but I would add these further comments. The Court of Criminal Appeals has construed article 15.22 to mean that an arrest is complete at the moment a person's freedom of movement is restricted or restrained. *Amores v. State,* 816 S.W.2d 407, 411 (Tex.Crim.App.1991); *Hoag v. State,* 728 S.W.2d 375, 379 (Tex. Crim.App.1987); *White v. State,* 601 S.W.2d 364, 366 (Tex.Crim.App.1980); *Colston v. State,* 511 S.W.2d 10, 12 (Tex.Crim.App. 1974); *Jefferson v. State,* 830 S.W.2d 320, 323 (Tex.App.—Austin 1992, pet. ref'd); TEX. CODE CRIM.PROC. art. 15.22 (Vernon 1977). Clearly appellant was placed under restraint, within the meaning of article 15.22, when at gunpoint he was forced to exit his car, assume a spread-eagled position with his hands on the roof of the car, and remain there for an unspecified length of time. *Hoag,* 728 S.W.2d at 379; *Colston,* 511 S.W.2d at 12.[1] I state *unspecified* length of time because, con-

*Woods,* the court of appeals did state that the test to determine whether an arrest was made was whether the display of authority was such that a reasonable person would believe he was not free to leave. However, *Woods* cited to both *Mendenhall* and *Daniels,* and no other cases as authority for this test for arrest. And as I said, *Mendenhall* and *Daniels* clearly state that that test is one to determine whether a Fourth Amendment seizure has taken place, not whether an arrest under state or federal law has taken place. While the Court of Criminal Appeals has yet to give a specific test for when a seizure rises to the level of an arrest, I would hold that something more is required than the detainee's reasonable belief that he is not free to leave. *See Amores,* 816 S.W.2d at 420 (Campbell, J. dissenting) (suggesting that restraint through the use of force or the imminent use of force by the detaining officer be the standard for characterizing a detention as an arrest within the "placed under restraint" provision of article 15.22).

trary to the State's assertion and the majority's inference that the backup officer who conducted the search arrived on the scene immediately after Officer Skrzycki, the record actually reflects that the duration between the stop and the search was somewhat longer. Officer Skrzycki testified at trial that she pulled appellant over at approximately 9:00 p.m., while Officer Meeley, the backup officer, testified at trial that he arrived on the scene at 9:55 p.m. Officer Meeley testified at the hearing on the motion to suppress that he received the dispatch at 9:55 p.m. I would infer that appellant was detained by force for some length of time. Furthermore, during this time, Officer Skrzycki did not attempt to conduct *any* sort of investigation by asking questions, or "frisking" appellant, or otherwise. Appellant was not even requested to provide his drivers' license or other identification until *after* he had been transported to the police station. In light of the officers' testimony, I do not believe that they pursued a means of investigation which confirmed or dispelled their suspicions quickly and in a manner that did not exceed the scope of the detention. *See Ussery v. State,* 651 S.W.2d 767, 770 (Tex. Crim.App.1983); *Anderson v. State,* 787 S.W.2d 221, 229 (Tex.App.—Fort Worth 1990, no pet.). Further, I do not believe that the methods of investigation utilized by the officers were the least intrusive reasonably available to confirm or dispel their suspicions in a brief period of time. *Anderson,* 787 S.W.2d at 229. The State simply failed to meet its burden of proof on this issue.

**b. Warrantless Arrest**

Having determined that appellant had been arrested without a warrant when the first search of the Bronco occurred, the next step is to determine whether the warrantless arrest was legal. I disagree with the majority's contention that the arrest was valid under TEX.CODE CRIM.PROC. art. 14.03(a)(1) (Vernon Supp.1995).

An arrest made without a warrant is deemed unlawful unless the State proves that a statutory exception to the warrant requirement applies. *Dejarnette v. State,* 732 S.W.2d 346, 349–50 (Tex.Crim.App.1987);

*Darden v. State,* 783 S.W.2d 239, 242 (Tex. App.—Corpus Christi 1989, pet. ref'd). It is the *State's* burden to show the warrantless arrest was supported by probable cause *and* fell within one of the statutory exceptions to the warrant requirement in chapter 14 of the code of criminal procedure. *Smith v. State,* 739 S.W.2d 848, 852 (Tex.Crim.App.1987); *Lunde v. State,* 736 S.W.2d 665 (Tex.Crim. App.1987); *Brown v. State,* 481 S.W.2d 106, 109 (Tex.Crim.App.1972). In the instant case, however, the State never even *refers* to chapter 14. Furthermore, the State never attempts to show that the detention at gunpoint was a valid warrantless arrest based on probable cause. Instead, they rely solely on their argument that, if an arrest occurred, it only occurred after the ammunition clip was seen on the console in the Bronco, which provided probable cause for the warrantless arrest. Given the finding that appellant was arrested before the officer saw the clip, the location of the clip obviously could not be probable cause. The State's attempt to prove suspicious circumstances sufficient to justify an investigative detention is not, in my opinion, a sufficient showing that the warrantless arrest was based on probable cause and came within an exception in chapter 14. *See Amores,* 816 S.W.2d at 416. Since the State failed to address its burden to prove that the arrest was justifiable under chapter 14 or supported by probable cause, the majority helpfully addresses it for them. I dissent.

The test for probable cause is whether "the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a particular person has committed or is committing an offense." *Amores,* 816 S.W.2d at 413; *Johnson v. State,* 722 S.W.2d 417, 421 (Tex.Crim.App. 1986), *overruled in part on other grounds, McKenna v. State,* 780 S.W.2d 797 (Tex. Crim.App.1989); *Woodward v. State,* 668 S.W.2d 337 (Tex.Crim.App.1982), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). The totality of the circumstances test is to be applied when determining probable cause for a warrantless arrest. *Amores,* 816 S.W.2d at 413. However,

in determining whether probable cause exists, we must examine only "the cumulative information known to all the officers at the time of the arrest." *Muniz v. State*, 851 S.W.2d 238, 251 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *Woodward*, 668 S.W.2d at 344. References to information which Patterson knew or observed, which was not included in the 911 transcript, are inappropriate in a discussion of probable cause.

The facts known to the dispatcher and Officer Skrzycki at the time of arrest were undisputed. Officer Skrzycki testified that she was en route to investigate a report of shots heard at an area three or four blocks from the park when Patterson made his 911 call. There is no evidence in the record on when or by whom the first report was made. The transcript of Patterson's 911 call is in the record. He told the dispatcher that "some fool" was riding through the park area. The dispatcher asked if he was shooting, and Patterson replied, "Yes." The dispatcher then told Officer Skrzycki (Seguin 945) that "the shots [were] seen coming from a blue and white Ford Bronco ..." Patterson stated to the dispatcher that the Bronco was currently headed back into the park area on the east side of the park, and that the shots sounded like a "nine millimeter." Patterson also confirmed that the Bronco was "coming up" to Guadalupe. Officer Skrzycki was heading south on Guadalupe when she first saw the blue and white Bronco heading north on Guadalupe, coming out of the park on the east side. She made a U-turn and followed the Bronco, activating her sirens. The Bronco then pulled over into a convenience store parking lot and the driver opened his door but did not exit the car. At that point, Officer Skrzycki ordered the occupants to exit the car, holding her revolver on them.[2] They complied with her order.

These are the *only* facts which we may consider in a determination of probable cause in this case. The majority extensively, and inappropriately, relies on facts outside police knowledge to support their conclusion that probable cause existed. For example, the

majority states twice (by unsubtle implication) that Officer Skrzycki saw "only one vehicle in the vicinity of the shooting," namely, the Bronco. I have reviewed all of Officer Skrzycki's testimony, as well as the entire record, and do not find any evidence to back up this assertion. Patterson did testify that the Bronco was the only car he saw coming from the trees, but that is irrelevant because he did not communicate this information to the police, and also because he was in a different location from Officer Skrzycki. The 911 transcript reveals that Patterson could no longer see the Bronco by the time he hung up the phone. Also, the majority states that when appellant was pulled over by Officer Skrzycki, he "refused" to exit the car, implying that his action was somehow unreasonable or indicative of guilt. Officer Skrzycki testified that she pulled her revolver on appellant and ordered him to exit the car before saying anything at all to him. Appellant never really had an opportunity to "refuse" to exit the car.

The majority also asserts that Patterson's "reliability" was a factor which the trial court could take into consideration when determining whether probable cause existed. I find this surprising in light of both Officer Skrzycki's and the dispatcher's testimony that neither knew Patterson or of his reputation for credibility or reliability at the time of the arrest. If a *police* broadcast is insufficient, standing alone, to support an arrest, how is the report of an informant of unknown reliability sufficient, standing alone, to support that arrest?

I do recognize that, when reviewing a trial court's ruling on probable cause, all inferences must be taken in the light most favorable to the ruling. However, there is another reason that article 14.03(a)(1) is inapplicable to support the warrantless arrest. Article 14.03(a)(1) states that police officers may arrest without a warrant:

[P]ersons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or

---

**2.** I would also note that Officer Skrzycki testified that the dispatcher's report on the 911 call from

Patterson was the only basis on which she made the initial stop.

threaten, or are about to commit some offense against the laws.

The only information given by the informant, Patterson, which was independently corroborated by Officer Skrzycki was that a blue and white Bronco was travelling on Guadalupe shortly after Patterson confirmed that it was "coming up" to Guadalupe. Officer Skrzycki neither heard or saw any shots fired nor saw any guns. There was no evidence that the Bronco was speeding, or committing any other traffic violations. Further, there was no evidence that appellant attempted to escape or otherwise acted in a suspicious manner when he was apprehended. In short, *none* of the activity which Officer Skrzycki observed prior to the point at which the weapons were found was inconsistent with innocent activity. The Court of Criminal Appeals has held repeatedly that "where events [observed by the officers] are as consistent with innocent activity as with criminal activity, the detention of a suspect based on those events is unlawful under Article 14.03(a)(1)." *Amores,* 816 S.W.2d at 414; *Hoag,* 728 S.W.2d at 379.[3] All appellant was doing was driving along a road. I would conclude that article 14.03(a)(1) simply does not apply to these circumstances.

Furthermore, none of the other statutory exceptions to the warrant requirement listed in Chapter 14 are applicable to this case. Appellant was never shown to be committing an offense within Officer Skrzycki's view. There was no claim that appellant had earlier committed any assault. There was no court order implicated in this cause. And finally, there was no evidence that it was represented to Officer Skrzycki by a credible person that appellant had committed a felony and was about to escape. Both she and the dispatcher testified that neither of them

knew the callers who reported the shots, or of their reputation for credibility at the time of the arrest. *See Amores,* 816 S.W.2d at 415–16; *Smith,* 739 S.W.2d at 852; *Colston,* 511 S.W.2d at 12. Because I would hold that appellant's arrest was an illegal warrantless arrest, I respectfully dissent.

---

**3.** In *Amores,* the arresting officer relied on information given him by an informant in making an arrest. The informant told him that a black male was committing a robbery in an apartment complex and was loading things into the trunk of his car. The informant also gave the officer the address of the complex. The officer arrived on the scene immediately and arrested a black male sitting in his car, about to drive away. The officer testified that he knew it was common practice during robberies to park backwards in a parking space, like the suspect was, because it

was easier to load things into the trunk. The officer also testified that he was familiar with the apartment complex, and that it was in a high crime area, and that he knew that no "blacks" lived there. The Court of Criminal Appeals held that the events which the officer observed upon arriving at the scene were as consistent with innocent activity as with criminal activity, and that the arrest of the suspect based on those events was unlawful under Article 14.03(a)(1). *Amores,* 816 S.W.2d at 413–14.