NO. 07-08-0296-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 21, 2010

_____

LEONARD L. MARTINEZ, SR., APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-416,142; HONORABLE JIM BOB DARNELL, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**OPINION**

Appellant, Leonard L. Martinez, Senior, was convicted by a jury of felony burglary of a habitation enhanced by two prior felony convictions and sentenced by the trial court to confinement for life. Appellant asserts (1) the evidence is legally and factually insufficient, and the trial court erred by (2) admitting an unwarned statement in violation of his right against self-incrimination and article 38.22 of the Texas Code of Criminal

Procedure; (3) admitting evidence of an extraneous burglary in violation of Rules 404(b) and 403 of the Texas Rules of Evidence; and (4) denying his motion to suppress evidence based upon an illegal arrest. We affirm.

## Background

On May 15, 2007, a Lubbock County Grand Jury returned an indictment against Appellant alleging that he intentionally entered the habitation of Candra Fulford, on or about April 24, 2007, without her consent, and with the intent to commit theft. The indictment also contained enhancement paragraphs which alleged Appellant had twice before been convicted of the felony offense of delivery of a controlled substance.

### I.      Hearing on Appellant's Motion to Suppress

In his motion to suppress, Appellant asserted he was illegally arrested without probable cause. As a result, he sought to suppress all evidence derived from the seizure. He also asserted his unwarned statements, made prior to receiving any admonition concerning his rights against self-incrimination, were inadmissible.

At the suppression hearing, Sergeant Mark Wims of the Lubbock Burglary Unit, testified that, on April 24, 2007, he received a call reporting a burglary at 2705 86th Street. That call implicated three Hispanic males and a maroon Ford Expedition in the burglary. The SUV's description was similar to a particular SUV linked to Leonard Martinez, Junior,

2

a burglary suspect that his unit had been investigating for several months.[1]  The ongoing investigation by the Burglary Unit linked Appellant, Martinez Junior (his son), and a maroon Ford Expedition with a dent on the rear hatch, to a house located at 2810 65th Street.[2]  After receiving the call reporting the burglary, Sergeant Wims sent out a call that the vehicle connected with the reported burglary matched the description of a similar vehicle seen parked at 2810 65th Street.

At approximately 11:30 a.m., Detective Bobby Thompson, Property Crime Division, received Sergeant Wims's call reporting a burglary involving three Hispanic males and a maroon Expedition that could be located at 2810 65th Street.  Detective Thompson proceeded to the location in an unmarked car.  When he didn't locate the Expedition, he parked in a lot across from the residence at the intersection of 65th and Canton Streets.  Sergeant Wims also proceeded to that location as did other officers responding to his call.  Sergeant Wims was aware Detective Thompson was on location looking for the vehicle.

At approximately 12:27 p.m., Detective Thompson spotted a maroon SUV driven by a Hispanic male.  After the SUV drove through the intersection, he pulled behind and turned on his flashing lights.  The SUV then pulled into the driveway at 2810 65th Street and stopped.

---

[1]Sergeant Wims initiated an investigation of Martinez Junior's activities after receiving anonymous tips that he was responsible for burglaries in the area and was attempting to sell stolen merchandise.

[2]Appellant, Martinez Junior, and a maroon Ford Expedition had been seen at the residence numerous times.  Appellant was believed to be living at the address.

In conformance with his training and experience, Detective Thompson treated the stop as a "high risk felony stop" because burglary suspects have been known to be armed. From a vantage point behind his car door and engine firewall, Detective Thompson drew his weapon and ordered the occupants out of the SUV. The driver exited and joined two passengers on the opposite side of the SUV. Detective Thompson then ordered the three men to lie down on the ground. Uncertain whether anyone was inside, he covered the front of the house and the SUV until Officer Richard Calderon arrived and handcuffed the three men. The officers then patted them down, separated them, and placed them in the back seats of different patrol cars for safety reasons. Detective Thompson testified they were not under arrest but detained for further investigation. After the scene was secured, Detective Thompson looked inside the SUV to make certain there were no other passengers and observed a Sony PlayStation and video camera lying in the front floorboard on the passenger side of the vehicle.

Detective Thompson then spoke to each of the three men without warning them of their rights against self-incrimination.[3] He asked their identities, where they lived, what they were doing at the residence, and whether there was anyone in the house. Appellant asserted he did not live at the residence but owned the SUV. Appellant also stated he

---

[3]The safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), come into play when a person in custody is subjected to either express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). A confession may be deemed "involuntary" either through a failure to comply with the dictates of *Miranda*, noncompliance with article 38.22 of the Code of Criminal Procedure or failure to comply with due process or due course of law because the confession was not freely given as a result of coercion, improper influences, or incompetency. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex.Crim.App. 1996).

loaned the SUV to his son whom he had just picked up. Appellant explained the PlayStation and video camera were in the vehicle "when he got there."

When questioned by Detective Thompson, Martinez Junior indicated Appellant and Daniel Trevino, the third passenger in the SUV, picked him up about eight minutes before the stop. He claimed the PlayStation and video camera were in the SUV when Appellant picked him up. Trevino refused to speak with Detective Thompson.

According to testimony given by Sergeant Wims, Candra Fulford, the victim who reported the burglary, was brought to the location of the stop. She placed Martinez Junior and the SUV at the scene of the burglary. Based upon surveillance connecting Appellant, Martinez Junior, the Ford Expedition and the residence at 2810 65th Street to a burglary investigation, the victim's identification of Martinez Junior and the Expedition as being involved in the Fulford burglary, the suspects' conflicting stories regarding their prior activities and the items found in the SUV, the three men were placed under arrest and the SUV impounded.

When the SUV's contents were inventoried, Detective Thompson found a receipt in the video camera bag from Royal Carribean International to Myrna Porras. Later that day, he arranged to meet Porras at her home. When she arrived, Porras determined that her house had been burglarized that morning while she was at work. She also identified the video camera, PlayStation, and jewelry taken from Trevino's pockets as belonging to her.

5

Appellant testified that, when he was arrested, he was driving his girlfriend's SUV. He further testified Detective Thompson asked for permission to search the SUV, Appellant refused, and the vehicle was searched without permission. He also testified that, while he was in the patrol car, Detective Thompson told him nothing was taken at the burglary on 86th Street. When asked by the State whether he voluntarily answered questions by Detective Thompson, Appellant responded affirmatively.

The trial court ruled that Appellant's statements made during the stop were inadmissible because he had not been "mirandized" but denied the remainder of the motion.

## II.    The Trial

Candra Fulford testified she lived at 2705 86th Street and was home with her little brother on the night of April 19, 2007, when a strange man began banging on the front door. There were no vehicles in the driveway because her older brother and parents were out for the evening. She did not recognize the caller but could tell he was Hispanic. After she phoned her mother who phoned her older brother, the man walked away. Her older brother arrived minutes later and confronted the man, who then left in a pickup.

On the morning of April 24, 2007, a day when everyone in the Fulford family was typically at school or work, Fulford was home alone because she was not feeling well. She again heard someone beating on the front door. When she looked out a window, she

6

observed the same man who had been pounding on the door several days earlier. She saw him walk away and enter a maroon Expedition with tinted windows. The Expedition was parked facing away from the cul-de-sac and, as it drove away, she observed a large dent in the rear end of the SUV. She called her mother and told her the same man was back. As instructed by her mother, Fulford locked the front and rear doors to the house securing the deadbolts.

Shortly thereafter, she heard two loud bangs and a cracking noise. She thought someone was in the house. She called her mother and then called 911. She locked herself in the bathroom and waited for the police to arrive. Within minutes, her grandfather arrived followed by police officers. Later, the same day, she accompanied the police to a location where she identified a Hispanic male as the person she had seen outside her house several nights earlier[4] and that same day. She also identified a maroon Expedition with tinted windows and a dented rear hatch as the vehicle she had seen the man enter outside her house that same day.

Detective Thompson next testified.[5] Appellant objected to any testimony related to Appellant's statements during the stop because Appellant was in custody and received no

---

[4]At trial, Hagen Fulford, Candra's brother, described the events that occurred after his arrival at their house the night of April 19. He identified Martinez Junior as the person he confronted walking through his front yard after he arrived. He also identified Martinez Junior's pickup truck parked outside his house. He could not identify the driver of the truck.

[5]Those portions of Detective Thompson's testimony at trial that mirrored his testimony at the suppression hearing will not be reiterated.

7

*Miranda* warnings. The State asserted that, because Appellant's counsel argued the SUV's ownership during his opening statement,[6] the State should be able to elicit testimony of Appellant's unwarned statements at the stop regarding the SUV's ownership. The trial court overruled Appellant's objection and permitted Detective Thompson to testify that, at the stop, Appellant informed him he owned the SUV.

Jose Velasquez testified, on the morning of the incident, he was preparing to eat breakfast when he saw someone jump the Fulford's back fence. Within seconds, he heard a loud smashing sound, ran to the back door, looked into the Fulford's yard, and observed two Hispanic males standing near the Fulford residence. He yelled, "Hey!" The two men then ran through Fulford's back yard gate bordering the alley. Velasquez observed the two men jump into an Expedition as it sped away. He told police the Expedition was a dark color, burgundy with a dent in the back near the latch beneath the rear window, and there were at least three persons in the Expedition. Later that day, he accompanied police officers to another location where he identified the Expedition he observed speeding away in the alley and Martinez Junior as one of the persons he observed running from the Fulford house.

Jeremy Winters, Crime Scene Officer, testified he had taken photographs of the Fulford's back door the day of the burglary. He testified there was a shoe print on the door.

---

[6] In his opening statement, Appellant's counsel asserted that, when the SUV was stopped by Detective Thompson, "[Appellant] just happened to be in the car that belonged to his girlfriend, which he had lent his son. . . ."

8

In his opinion, the door was locked and either kicked in, or forced open by someone putting their shoulder to the door, with sufficient force to remove a deadbolt from the door jamb. Al Erucliani, Fulford's grandfather, testified the door "was just totally blown off" and "everything was busted on the door."

Sergeant Wims testified[7] that, when inventoried, the SUV contained two crowbars, a Colt air pistol, a prepaid mobile phone, walkie-talkies, black cotton gloves, and leather gloves. The items located beneath the front seat and within the center console were, in his training and experience, frequently used as weapons or criminal instruments, *i.e.,* burglary tools. He also testified the Fulford residence, Porras residence, and the location where the SUV was stopped were located near each other off University Avenue. He estimated the locations were no more than ten to fifteen minutes apart traveling by car.

Officer Sean Gonzales testified that, prior to April 24, he had observed the SUV in the driveway at 2810 65th Street. He also observed Appellant and Martinez Junior near the SUV at that location. Officer Billy Green testified that, when he spoke with Velasquez the day of the burglary, Velasquez told him he observed two persons in the SUV's backseat as it sped away in the alley. Myrna Porras testified that the video camera and PlayStation found in the SUV were her property. She also identified the jewelry found on Trevino's person as her own. Although Appellant objected to any evidence of the Porrras burglary being admitted because the evidence was irrelevant under Rule 401 of the Texas Rules

---

[7]Those portions of Sergeant Wims's testimony at trial that mirrored his testimony at the suppression hearing will not be reiterated.

of Evidence[8] and impermissible character evidence under Rule 404(b), the trial court overruled the objection.

At the conclusion of the evidence, the jury returned a verdict of guilty on the felony offense of burglary of a habitation. Appellant pled true to the indictment's two enhancement paragraphs and the trial court sentenced Appellant to confinement for life. This appeal followed.

**Discussion**

Appellant first asserts the evidence at trial was legally and factually insufficient to convict him because the State failed to prove anyone entered the Fulford residence. He next asserts the trial court erred by admitting into evidence Appellant's unwarned statement that he owned the SUV. He contends the trial court erred by admitting evidence of the Porras burglary because the extraneous offense was irrelevant and more prejudicial than probative. Finally, he contends the trial court erred by denying his motion to suppress all evidence discovered as a result of the stop because the officers did not have probable cause to arrest him when he was ordered out of the SUV, told to lie on the ground, handcuffed, and placed in the backseat of a patrol car.

---

[8]For convenience, the Texas Rules of Evidence will be cited throughout the remainder of this opinion simply as "Rule ___."

10

Logic dictates that we consider Appellant's evidentiary issues before making a determination whether the evidence is legally and factually sufficient. Accordingly, we will address Appellant's suppression (Issue 7) and evidentiary (Issues 3, 4, 5 and 6) issues prior to his sufficiency issues (Issues 1 and 2).

## I.      Motion To Suppress

Appellant contends Detective Thompson effected an unlawful arrest by drawing his service weapon, ordering him out of the SUV onto the ground, handcuffing him, and placing him in the backseat of a patrol car because Detective Thompson lacked probable cause to arrest him for burglary at that time. As a result, Appellant asserts the trial court should have suppressed all evidence obtained by the officers after Appellant was stopped.

### A.      Standard of Review

A trial court's ruling on a motion to suppress is reviewed for abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002); *Hudson v. State*, 247 S.W.3d 780, 783 (Tex.App.–Amarillo 2008, no pet.). In reviewing a trial court's determination of the reasonableness of a temporary investigative detention, appellate courts use a bifurcated standard of review. *Ford v. State,* 158 S.W.3d 488, 493 (Tex.Crim.App. 2005). Almost total deference is given to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *St. George v. State,* 237 S.W.3d 720,

11

725 (Tex.Crim.App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). The same level of deference is also afforded to a trial court's ruling on application of law to fact questions or mixed questions of law and fact if the resolution of those questions also turn on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex.Crim.App. 2006). However, if mixed questions of law and fact do not fall within these categories, appellate courts may conduct a *de novo* review of the trial court's ruling. *Guzman,* 955 S.W.2d at 87.

When, as here, no findings of fact were requested nor filed, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. *See State v. Ross*, 32 S.W.3d 853, 855-56 (Tex.Crim.App. 2000). If the trial court's decision is correct on any theory of the law applicable to the case, it will be sustained. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex.Crim.App. 2003); *Ross*, 32 S.W.3d at 855. Further, the legal question of whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion underlying an investigatory detention is reviewed *de novo*. *See State v. Sheppard,* 271 S.W.3d 281, 286-87 (Tex.Crim.App. 2008); *Kothe v. State,* 152 S.W.3d 54, 62-63 (Tex.Crim.App. 2004).

**B.      Investigatory Detention v. Arrest**

The Fourth Amendment does not forbid all seizures, just unreasonable seizures; *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex.Crim.App.), *cert. denied*, 522 U.S. 894, 118 S.Ct. 236, 139 L.Ed.2d 167 (1997), and, for purposes of constitutional analysis,[9] both investigative detentions and arrests are seizures of a citizen by law enforcement officers. *Zayas v. State*, 972 S.W.2d 779, 789 (Tex.App.–Corpus Christi 1998, pet. ref'd). The differences between the two are the degrees of intrusion involved and the different legal justifications required of each. *Id.* at 788-89.

An investigative detention occurs when an officer lacks probable cause to arrest but nonetheless possesses a reasonable suspicion: that is, the officer is able to point to specific, articulable facts that, taken together with rational inferences from those facts, reasonably warrants the detention. *Davis v. State*, 947 S.W.2d 240, 244 (Tex.Crim.App. 1997). The articulable facts used by the officer must create some reasonable suspicion that some activity out of the ordinary is occurring, or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to criminal activity. *Id.* (citing *Meeks v. State*, 653 S.W.2d 6, 12 (Tex.Crim.App. 1983 ). An arrest, on the other hand, is a greater restraint upon a person's freedom to leave or move than is a temporary detention which also restrains a person's freedom.

---

[9]Texas courts follow federal standards with respect to temporary investigative stops and arrests rather than apply a more stringent standard under the Texas Constitution. *Johnson v. State*, 912 S.W.2d 227, 231-34 (Tex.Crim.App. 1995).

*Shepard*, 271 S.W.3d at 290. "If the degree of incapacitation appears more than necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation, this suggests the detention is an arrest." *Id.* (quoting 40 George E. Dix and Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 7.34, 462 (2d ed. 2001)).

The standard for distinguishing between an arrest and investigative detention is not always clear because the distinction between these seizures rests on a fact-specific inquiry rather than clearly delineated criteria. *Johnson*, 912 S.W.2d at 235. *See Morris v. State*, 50 S.W.3d 89, 94 (Tex.App.–Fort Worth 2001, no pet.); *Josey v. State*, 981 S.W.2d 831, 839 (Tex.App.–Houston [14th Dist.] 1998, pet. ref'd). By definition, "[a] person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant." Tex. Code Crim. Proc. Ann. art. 15.22 (Vernon 2005). This "restraint of liberty" standard, however, is not adequate when distinguishing between an arrest and a detention because it is a characteristic common to both. *Frances v. State*, 922 S.W.2d 176, 179 (Tex.Crim.App. 1996) (J. Baird, concurring and dissenting). Whether a person is under arrest or subject to a temporary investigative detention is a matter of degree and depends on the length of the detention, the amount of force employed, and whether the officer actually conducts an investigation. *See Woods v. State*, 970 S.W.2d 770, 775 (Tex.App.–Austin 1998, pet. ref'd).

During an investigative detention, an officer may employ the force necessary to effect the reasonable goals of the detention: investigation, maintenance of the *status quo*, and

14

officer safety. *Rhodes,* 945 S.W.2d at 117. An officer may conduct a limited pat-down search of the outer clothing for weapons during an investigative detention if the officer fears for his safety or that of others. *Josey,* 981 S.W.2d at 840 (citing *Davis v. State*, 829 S.W.2d 218, 220 (Tex.Crim.App. 1992). Police officers are not required to use the "least intrusive means" to verify or dispel their suspicions; *United States v. Sokolow*, 490 U.S. 1, 11, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), however, if the force utilized exceeds that reasonably necessary to effect the goal of the stop, this force may transform an investigative detention into a full-blown arrest. *See State v. Moore*, 25 S.W.3d 383, 386 (Tex.App.–Austin 2000, no pet.).

Because an officer's safety may be threatened by a passenger's access to weapons in an automobile, an officer may, as a matter of course, order a passenger lawfully stopped to exit the vehicle; *Rhodes*, 945 S.W.2d at 118 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1997), and lie down on the ground pending completion of the stop. *See Smith v. State*, 813 S.W.2d 599, 601 (Tex.App.–Houston [14th Dist.] 1991, pet. ref'd) (investigative detention not transformed into an arrest when officer requested that suspect exit his car, lie on the ground, and submit to a pat-down for officer safety reasons). Furthermore, approaching a vehicle with a service weapon drawn does not transform an investigative detention to an arrest. *See Marsh v. State*, 684 S.W.2d 676, 679 (Tex.Crim.App. 1984) (one officer approaching driver's side of vehicle with a rifle drawn, while another officer approached the passenger's side of vehicle with his gun in

15

hand); *Mount v. State*, 217 S.W.3d 717, 726-27 (Tex.App.–Houston [14th Dist.] 2007, no pet.).

Likewise, the use of handcuffs does not automatically convert an investigative detention into an arrest; *Shepard*, 271 S.W.3d at 286, and there is no bright line rule that handcuffing a suspect always constitutes an arrest; *Rhodes*, 945 S.W.2d at 116-18. Ordinarily handcuffing a suspect is more consistent with a full-blown arrest than it is with an investigatory detention; *Rhodes*, 945 S.W.2d at 117, however, an officer may resort to handcuffs without transforming an investigative detention into an arrest when he or she is reasonably concerned for their safety or to maintain the *status quo*. *Shepard*, 271 S.W.3d at 286 (handcuffed suspect during investigative detention for safety purposes and to maintain *status quo*). *See also Balentine*, 71 S.W.3d at 771 (investigative detention did not evolve into an arrest simply because appellant was escorted to patrol car and handcuffed); *Rhodes*, 945 S.W.2d at 116-118 (appellant required to exit vehicle and handcuffed); *Mays v. State*, 726 S.W.2d 937, 944 (Tex.Crim.App. 1986), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1020 (1988) (frisked and handcuffed); *Spight v. State*, 76 S.W.3d 761, 769-70 (Tex.App.–Houston [1st Dist.] 2002, no pet.) (handcuffed); *Goldberg v. State*, 95 S.W.3d 345, 360 (Tex.App.–Houston [1st Dist.] 2002, pet. ref'd), *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1436, 158 L.Ed.2d 99 (2004) (handcuffed); *Morris*, 50 S.W.3d at 97-98 (removed from truck at gunpoint, placed on ground, and handcuffed behind back); *Josey*, 981 S.W.2d at 839-40 (removed from car, patted-down, and handcuffed); *Nargi v. State*, 895 S.W.2d 820, 823 (Tex.App.–Houston [14th Dist.] 1995),

16

*pet. dism'd, improvidently granted*, 922 S.W.2d 180 (Tex.Crim.App. 1996) (handcuffed); *Salazar v. State*, 805 S.W.2d 538, 540 (Tex.App.–Fort Worth 1991, pet. ref'd) (removed from car, hands on head, handcuffed, and patted-down).

In the absence of a reasonable safety concern or need to maintain the *status quo*, however, officers' use of force to secure a suspect has been held to constitute an arrest. *See Amores v. State*, 816 S.W.2d 407, 411-12 (Tex.Crim.App. 1991) (arrest where handcuffed and no investigation performed). *See also Burkes v. State*, 830 S.W.2d at 925 (arrest where handcuffed and no investigation performed); *Akins v. State*, 202 S.W.3d 879, 888 (Tex.App.–Fort Worth 2006, pet. ref'd) (arrest where car boxed in, approached with guns drawn, placed on ground, and handcuffed in absence of any necessity to maintain officer safety or *status quo*); *Moore*, 25 S.W.3d at 386-87 (forgery suspect handcuffed in absence of officer safety concern); *Gordon v. State*, 4 S.W.3d 32, 37 (Tex.App.–El Paso 1999, no pet.) (handcuffed and placed in backseat of patrol car solely to keep suspect out of house while K-9 search performed); *Rodriquez v. State*, 975 S.W.2d 667, 675-77 (Tex.App.–Texarkana 1998, pet. ref'd) (boxed in car, removed suspect at gunpoint, had him lie face down in parking lot, and performed no investigation); *Flores v. State*, 895 S.W.2d 435, 441 (Tex.App.–San Antonio 1995, no pet.) (removed from car at gunpoint assuming spread-eagle position with hands on roof of car, officer testified suspect was not free to leave, and no evidence of officer safety concerns).

17

In evaluating whether police conduct during an investigatory detention is reasonable, common sense and ordinary human experience govern over rigid criteria. *See Rhodes*, 945 S.W.2d at 118. Whether a detention is an actual arrest or an investigative detention depends on the reasonableness of the intrusion under all the facts. *Id.* Reasonableness is measured by balancing the nature of the intrusion into an individual's Fourth Amendment interests against the public interest of legitimate government interest at stake; *Zayas*, 972 S.W.2d at 789, and must be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight. *Rhodes*, 945 S.W.2d at 118. Allowances must be made for the fact that officers must often make quick decisions under tense, uncertain, and rapidly changing circumstances. *Id.* Additional factors to consider in determining the reasonableness of the detention include the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the number of suspects present, and the reaction of each suspect. *See Akins v. State*, 202 S.W.3d at 885 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). The officer's opinion, while not determinative, is another factor to be considered. *Amores*, 816 S.W.2d at 413. Also very important is whether the officers actually conducted an investigation after seizing the suspect. *Burkes*, 830 S.W.2d at 925; *Moore*, 25 S.W.3d at 386.

Based on the information known to the officers investigating the burglary at the Fulford residence, gathered by Sergeant Wims as a result of the Burglary Units ongoing investigation of Martinez Junior and the observations of Detective Thompson, we find the

18

police acted within constitutional parameters of a reasonable investigative detention.[10]  *See, e.g., Gaines v. State*, 888 S.W.2d 504, 509 (Tex.App.–El Paso 1994, no pet.) (finding reasonable suspicion where officer saw two black males in a yellow Honda Civic on a certain road after receiving a radio broadcast that two black males had committed a burglary only minutes before, and fled in a late model yellow Honda Civic and were last seen traveling south on the same road).  Appellant's detention was reasonably related in scope to the circumstances that justified the interference at the outset and lasted only so long as was reasonably necessary to include, or exclude, him as a suspect.  After obtaining conflicting responses to questions related to their prior whereabouts and ownership of property in the SUV, Appellant was detained until Fulford and Velasquez could be brought to the scene.[11]  After Fulford and Velasquez placed the maroon SUV and Martinez Junior at the Fulford residence at the time of the burglary, sufficient probable cause for arrest existed, and Appellant was arrested.

---

[10]Detective Thompson stopped the SUV pursuant to radio calls describing the suspects in a felony burglary as three Hispanic males driving a maroon Expedition that could be located at the address where the SUV ultimately stopped.  When there has been some cooperation among the police officers, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists. *Hoag v. State*, 728 S.W.2d 375, 380 (Tex.Crim.App. 1987). Moreover, the determination of reasonable suspicion is not limited to the facts solely within the detaining officer's knowledge. *See State v. Jennings*, 958 S.W.2d 930, 933 (Tex.App.–Amarillo 1997, no pet.).  Reasonable suspicion can also be based on information relayed to one officer by other officers and the sum of the information known to those officers cooperating with him.  *See Fearance v. State*, 771 S.W.2d 486, 509 (Tex.Crim.App. 1988), *cert. denied*, 492 U.S. 927, 109 S.Ct. 326, 196 L.Ed.2d 611 (1989).

[11]The continuation of a temporary detention may be justified by efforts to determine whether the victim or a witness can identify the suspect.  *Clarke v. State*, 785 S.W.2d 860, 869 (Tex.App.–Fort Worth 1990), *aff'd*, 811 S.W.2d 99 (Tex.Crim.App. 1991), *cert. denied*, 502 U.S. 946, 112 S.Ct. 390, 116 L.Ed.2d 340 (1991) (citing *Mays v. State*, 726 S.W.2d 937, 944 (Tex.Crim.App. 1986) (*en banc*)).

We find the duration of the stop was reasonable and the officers diligently pursued a means of investigation that was likely to dispel or confirm their suspicions as quickly as possible. *See Josey*, 981 S.W.2d at 840-41 (ninety minute detention reasonable). The SUV was stopped at approximately 12:30 p.m. By 1:23 p.m., the SUV and Martinez Junior had been identified, and the three men arrested were in the process of being transported to jail. During this period of time, the officers stopped Appellant, secured the scene, identified the three men, questioned them regarding their whereabouts and ownership interest in the SUV, concluded the identification process with Fulford and Velasquez, arrested the three men, and inventoried the SUV's contents.

The force Detective Thompson employed during the detention was also reasonable under the circumstances. Detective Thompson acted alone when he stopped an SUV anticipated to contain at least three suspects in a felony burglary. The SUV's windows were tinted and stopped at its destination, a house with two windows facing the street–curtains drawn. In his experience and training, he treated the stop as a "high risk felony stop" because burglars are known to be armed. He was also concerned for his safety because he did not know how many occupants were in the SUV, whether they had weapons, and whether there were persons in the house that might also be armed.

After the SUV's occupants were lying on the ground, Detective Thompson kept an eye on the SUV and the house while Officer Calderon handcuffed Appellant and his two passengers. The three were then patted-down after which Detective Thompson visually swept the SUV from outside to assure there were no other passengers. As he did so, he

20

observed a video camera and gaming device in the front floorboard of the passenger side. When the scene was secured, Detective Thompson placed the three men in the backseats of separate patrol cars for safety reasons and to maintain the *status quo*. He questioned them regarding their identities, the SUV's ownership, their whereabouts that day, where they lived, and whether anyone was in the house. After receiving inconsistent explanations of their whereabouts and the ownership of property on the floorboard, he ceased questioning and awaited the arrival of Fulford and Velasquez.

We find Detective Thompson's need for officer safety and to maintain the *status quo* during the investigative detention reasonable. He was outnumbered at the outset and attempting to initiate an investigation in an open area where he could easily be targeted from the SUV's tinted windows or the residence linked to the suspects. After he secured the area, he conducted an investigation appropriate to an investigative detention. He held Appellant only so long as was necessary to eliminate or verify him as a suspect. After Fulford and Velasquez identified the SUV and Martinez Junior, the three men were arrested and the SUV impounded. The entire detention took a little less than an hour. On this record, we find Appellant's detention was reasonable under the circumstances and the trial court did not abuse its discretion in denying Appellant's motion to suppress evidence due to an illegal arrest. Appellant's seventh issue pertaining to the trial court's overruling of his motion to suppress is overruled.

## II.      Unwarned Statement

Appellant next asserts the trial court improperly permitted the State to offer evidence of his unwarned statement that he was the SUV's owner because, at the time the unwarned statement was made, he was in custody and the subject of a custodial interrogation.  He contends the trial court admitted the unwarned statement in violation of the dictates of *Miranda, supra,* and article 38.22 of the Texas Code of Criminal Procedure.

For purposes of analysis, we will assume without deciding error in the admission of Appellant's statement and proceed directly to the harm analysis.  *See Coleman v. State*, 188 S.W.3d 708, 726 (Tex.App.–Tyler 2005, pet. ref'd) (assuming error in admission of complained-of evidence and addressing appellant's contention that error was harmful). Because a correct ruling in this instant is constitutionally required under *Miranda*; *see Dickerson v. United States*, 530 U.S. 428, 439-40, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the error is constitutional error; *Alford v. State*, 22 S.W.3d 669, 673 (Tex.App.–Fort Worth 2000, pet. ref'd), and Rule 44.2(a) is applicable.  Tex. R. App. P. 44.2 (a).  Thus, we evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution; *Harris v. State,* 790 S.W.2d 568, 586 (Tex.Crim.App. 1989); *Kane v. State*, 173 S.W.3d 589, 594 (Tex.App.–Fort Worth 2005, no pet.), and must reverse unless we determine beyond a reasonable doubt that error did not contribute to Appellant's conviction or punishment.  *Alford*, 22 S.W.3d at 673.

22

Appellant contends the State used his unwarned admission, that he owned the SUV, to link him to the burglary. Aside from the unwarned statement, the State's evidence showed that (1) the police had received anonymous tips that Appellant's son was involved in burglaries and was attempting to sell stolen property; (2) Appellant had been observed numerous times at the residence on 65th Street with his son and the SUV; (3) on the day of the burglary, Appellant was driving the SUV when Detective Thompson made the stop approximately an hour after the burglary was reported; (4) the SUV contained burglary tools in and around the console between the driver's and front passenger's seats; (5) stolen property from a second burglary that occurred nearby that morning was lying on the front floorboard on the passenger side of the SUV in clear view; (6) Appellant's version of how he came to be driving the SUV at the time of the stop and his son's version conflicted; (7) Appellant's version of how the stolen items in the floorboard came to be in the SUV and his son's version also conflicted; (8) Velasquez told police he observed two Hispanic males jump into a moving SUV in the alleyway;[12] (9) Velasquez and the victim placed the SUV and Appellant's son at the scene of the burglary; (10) the victim also placed Appellant's son at the burgled residence several days before; (11) the victim's brother placed Appellant's son, his pickup, and an unknown driver at the victim's residence several days before the

[12]Although Velasquez's testimony at trial and his statements to police officers at the scene of the burglary appeared to equivocate regarding the number of persons he saw leaving the Fulford residence in the SUV and where they were positioned inside the vehicle, a jury is in the best position to evaluate the credibility of witnesses, and we are required to afford "due deference" to jury determinations. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2000). "A jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony;" *Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim.App. 1994) *cert. denied*, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994), and "reconciliations of conflicts in the evidence is within the exclusive province of the jury." *Losada v. State*, 721 S.W.2d 305, 309 (Tex.Crim.App. 1986).

burglary; and, (12) Trevino, a passenger in the SUV being driven by Appellant at the time of the stop, had stolen property on his person from a second burglary that occurred that morning. Having reviewed the entire record, we find beyond a reasonable doubt that the error did not contribute to Appellant's conviction. Appellant's third and fourth issues are overruled.

### III.    Extraneous Offense

Appellant next asserts the trial court erred by admitting extraneous offense evidence of the Porras burglary that occurred the same morning as the Fulford burglary. He contends its admission violated Rules 404(b) and 403 because the evidence was irrelevant and overly prejudicial. He also asserts the trial court erred in its admission because the State failed to prove the Porras burglary beyond a reasonable doubt.

As a general rule, to prevent an accused from being prosecuted for some collateral crime or misconduct, the State may not introduce evidence of bad acts similar to the offense charged. *Roberts v. State*, 29 S.W.3d 596, 600-01 (Tex.App.–Houston [1st Dist.] 2000, pet. ref'd). Rule 404(b) provides that evidence of "other crimes, wrongs or acts" is not admissible to prove a defendant's character in order to show action in conformity therewith. Nevertheless, such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex. R. Evid. 404(b). In addition, a "party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less

24

probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact." *Martin v. State*, 173 S.W.3d 463, 466 (Tex.Crim.App. 2005).

Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim.App. 2003). So, too, is a ruling on the balance between probative value and the countervailing factors set out in Rule 403, although that balance is always slanted toward admission of otherwise relevant evidence. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex.Crim.App. 2009). Thus, we review a trial court's decision to admit extraneous offenses under an abuse-of-discretion standard; *Prible v. State*, 175 S.W.3d 724, 731 (Tex.Crim.App. 2005), *cert. denied*, 546 U.S. 962, 126 S.Ct. 481, 163 L.Ed.2d 367 (2005), and, so long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion and the trial court's ruling will be upheld. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (op. on reh'g). *See Hernandez v. State*, 205 S.W.3d 555, 558 (Tex.App.--Amarillo 2006, pet. ref'd).

Where the charge is burglary with intent to commit theft, the offense is complete if the entry is made with the requisite intent, regardless of whether a theft is actually committed . *Moore*, 54 S.W.3d at 539. Here, we conclude evidence of the Porras burglary was admissible to show the intent with which "entry" was made into the Fulford residence, *i.e.,* intent to commit theft. The Porras burglary was close in time and location to the

Fulford burglary and subsequent stop on 65th Street. Moreover, the SUV driven by Appellant contained property stolen from the Porras residence but no property stolen from the Fulford residence. Thus, evidence of the Porras burglary was relevant under Rules 401 and 404(b) to establish an elemental fact, *i.e.,* intent to commit theft. *See, e.g., Banda v. State*, 768 S.W.2d 294, 296 (Tex.Crim.App. 1989) *cert. denied*, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 270 (1989) ("an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable").

We must next consider whether the unfair prejudicial effect of the extraneous evidence substantially outweighed its probative value and, in doing so, we give great deference to the trial court's determination of admissibility. *Montgomery*, 810 S.W.2d at 391-92. Here, any prejudicial effect of admitting the extraneous offense evidence was outweighed by its probative value. The evidence of the Porras burglary was near in time and location to the Fulford burglary and necessary for the jury to consider in its determination whether the entry into the Fulford residence was for the purpose of committing theft. Thus, we agree with the trial court's determination that evidence of the Porras burglary was not so egregious as to be highly prejudicial.

Finally, whether an extraneous offense or bad act is established beyond a reasonable doubt is a question of fact for the jury, not a preliminary question of admissibility for the trial court. *Mitchell v. State*, 931 S.W.2d 950, 953-54 (Tex.Crim.App.

26

1996).  *See Nanez v. State*, 179 S.W.3d 149, 151-52 (Tex.App.–Amarillo 2005, no pet.).[13]

Once all of the evidence was in, the trial court properly instructed the jury that, before it could consider extraneous act evidence in its determination of guilt or innocence, it must be satisfied beyond a reasonable doubt that the acts are attributable to the defendant.

Here, the trial court did exactly what is required when considering the issue of extraneous offenses.  *See Jordan v. State*, 271 S.W.3d 850, 855-56 (Tex.App.–Amarillo 2008, no pet.).  Consequently, the trial court did not abuse its discretion in admitting this evidence.  Appellant's fifth and sixth issues are overruled.

## IV.    Legal and Factual Sufficiency

When appellant challenges both legal and factual sufficiency, we are required to conduct an analysis of the legal sufficiency of the evidence first and then, only if we find the evidence to be legally sufficient, do we analyze the factual sufficiency of the evidence. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996).  In assessing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.   *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. 2007).

---

[13]Although the trial court is the sole authority on the threshold issue of admissibility of relevant evidence, the jury determines whether the burden of proof of extraneous offenses presented has been satisfied.  *Nanez,* 179 S.W.3d at 152.

In a factual sufficiency review, we must consider all of the evidence in a neutral light to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State,* 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). In our analysis we must determine whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. *See Steadman v. State,* 280 S.W.3d 242, 246 (Tex.Crim.App. 2009). A wrong and unjust verdict includes instances in which the jury's findings "shocks the conscience," or clearly demonstrates bias. *See Grotti v. State,* 273 S.W.3d 273, 280 (Tex.Crim.App. 2008). In doing a factual sufficiency review, we must be mindful that a jury has already passed on the facts and must give due deference to the determinations of the jury. *See Lancon v. State,* 253 S.W.3d 699, 704-05 (Tex.Crim.App. 2008). If our decision is to set aside the verdict of the jury, our opinion should clearly explain how the evidence supporting the verdict is too weak on its own or how the contradicting evidence so greatly outweighs the evidence in support of the verdict. *See id.* Conversely, if our decision is to uphold a verdict, we are required to consider the most important evidence that the appellant claims undermines the jury's verdict and explain why that evidence does not have the persuasive force the appellant believes is sufficient to overturn the verdict. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

In a sufficiency of the evidence review, the essential elements of the offense are those of a hypothetically correct jury charge for the offense in question (*i.e.,* one that accurately sets out the law and adequately describes the offense for which the appellant

was tried without increasing the state's burden of proof or restricting the state's theory of criminal responsibility.) *Hooper,* 214 S.W.3d at 14; *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).

Circumstantial evidence alone is sufficient to establish the guilt of the accused and the standard of review as to the sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *Hooper,* 214 S.W.3d at 13. Each fact need not point directly and independently to the guilt of the accused, so long as the cumulative force of all the evidence, when coupled with reasonable inferences to be drawn therefrom, is sufficient to support the conviction. *Evans v. State,* 202 S.W.3d 158, 166 (Tex.Crim.App. 2006).

Appellant asserts the evidence at trial was legally and factually insufficient because, although the back door of the residence was kicked in, there was no testimonial or physical evidence that anyone actually entered the Fulford residence or took any property from that residence. More specifically, Appellant contends there was no evidence that the "close" of the Fulford residence was broken.

A person commits the second degree felony offense of burglary if he or she *enters* a habitation, without the consent of the owner, with the intent to commit a felony, theft or an assault. Emphasis added. *See* Tex. Penal Code Ann. § 30.02(a), (c)(2) (Vernon 2003). A person "enters" a habitation if he or she intrudes any part of their body, or any physical object connected to their body. *Id.* at § 30.02(b). "Entry" is established when the plane of the opening of the house is broken, and may be accomplished by placing a foot inside a

door frame, by cutting window or door screens, or by breaking a door lock or frame. *See Ortega v. State*, 626 S.W.2d 746, 747 (Tex.Crim.App. 1981) (concluding there was "entry" when evidence showed screen door latch was pulled off, wooden door's knob was disabled, and pry marks were on wooden door). *See also Moore v. State*, 54 S.W.3d 529, 539-40 (Tex.App.–Fort Worth 2001, pet. ref'd) (testimony of 11-year-old victim that defendant "entered" the house by placing his foot in the door with intent to engage in sexual contact with the victim held factually sufficient to support conviction for burglary of a habitation); *Williams v. State*, 997 S.W.2d 415, 417 (Tex.App.–Beaumont 1999, no pet.) (evidence of broken padlock and broken door frame on garage established entry into building as required for burglary of building); *Woods v. State*, 814 S.W.2d 213, 215-16 (Tex.App.–Tyler 1991, no pet.) (homeowner's testimony that four window screens and door screen had been cut, along with police officer's testimony that defendant was apprehended nearby with a knife in his hand, was sufficient evidence of accused's "entry" into habitation); *Hayes v. State*, 656 S.W.2d 926, 927 (Tex.App.–Eastland 1983, no pet.) (jury could properly infer "entry" from presence of lug wrench and hole in the roof of a store). Thus, entry can be any breach of the "close" of the residence.

The entry element of a burglary offense may be proven by inferences, just as inferences may be used to prove the elements of any other offense. *Lopez v. State*, 884 S.W.2d 918, 921 (Tex.App.–Austin 1994, pet. ref'd). Moreover, Section 30.02 "does not require proof of a completed theft; all that needs to be shown is an *attempt* to commit a felony or theft." *Williams*, 997 S.W.2d at 418 (emphasis added).

At trial, Fulford testified she heard two loud bangs, then a cracking noise, and she thought someone was in the house. Officer Winters testified there was a shoe print on the backdoor and, in his opinion, the door had been kicked in or shouldered open with sufficient force to tear the deadbolt from the door jamb. His photographs showed the back door opened into the house with the deadbolt torn from the jamb, dangling from the cracked door frame. Fulford's grandfather testified the door was "totally blown off" and "everything was busted on the door." This testimony along with Officer Winters's photographs were sufficient for the jury to find beyond a reasonable doubt that some part of the burglar's body, presumably either a shoulder or foot, breached the plane, or "close," of the Fulford residence thereby establishing the element of "entry." Accordingly, having reviewed the entire record, we find that the jury's findings were rational and the great weight and preponderance of the evidence supports, rather than contradicts, the verdict. *See Williams,* 997 S.W.2d at 417 ("the action of breaking the lock and door frame was the 'breaking of the close'"). Appellant's first and second issues are overruled.

## Conclusion

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice

Publish.